# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

KEVIN O'KANE,

      Plaintiff,

v.

IMPACTIVATE NETWORKS, INC.,
ROBERT KINCAID, JOHN
MORTENSON, and DANIEL
GALLAGHER, ESQ.,

      Defendants.

1:18-cv-01653-NLH-AMD

**OPINION**

---

**APPEARANCES:**

AMANDA JANE DAVIDSON
ADAMS KEARNEY LLC
6 E. HINCKLEY AVE.
RIDLEY PARK, PA 19078
    *On behalf of Plaintiff*

DAVID R. CASTELLANI
CASTELLANI LAW FIRM, LLC
450 TILTON ROAD
SUITE 245
NORTHFIELD, NJ 08225
    *On behalf of Defendants*

**<u>HILLMAN</u>, District Judge**

This dispute arises out of a business and alleged employment relationship between Plaintiff, Kevin O'Kane, and Defendant, Impactivate Networks, Inc. Presently before the Court is Defendants' motion for summary judgment, in which they argue that Plaintiff lacks standing to bring his claims for breach of contract, breach of implied contract, quasi contract,

breach of the covenant of good faith and fair dealing, and
quantum meruit.  Defendant also contends that Plaintiff cannot
maintain his New Jersey Wage Payment Law claim because he was
not an employee of Impactivate.  Plaintiff has opposed
Defendants' motion.  For the reasons expressed below,
Defendants' motion will be denied.

## BACKGROUND

Impactivate is multi-media company that provides digital
display advertising services in Atlantic City, New Jersey.
Located on the Atlantic City boardwalk, Impactivate is a network
of digital video screens that can house live programming and
digital LED displays.  The Impactivate network consists of
digital screens spanning 1.7 miles that curve every 140 feet,
connected by approximately 800 linear miles of fiber strand
underneath the boardwalk.  Additionally, the Impactivate network
is capable of providing sound, Wi-Fi hotspots, security cameras,
and charging stations, along with other experiential elements.
(O'Kane Dep. Tr. 69:15-25).  According to Impactivate's Chief
Executive Officer, Michael Binder, Impactivate "sells
advertising."  (Binder Dep. Tr. 26:17).

BDT Media Management, Inc. ("BDT") is a business-advisory
firm, owned and operated by Plaintiff Kevin O'Kane, that
provides media-related consulting services in the Greater

2

Philadelphia Area.  O'Kane and his wife are BDT's two and only shareholders.

In July 2014, O'Kane was approached by then Chief Revenue Officer, Bill Smith, to assist Impactivate's start-up efforts. (Binder Dep. Tr. 47:8-17).  O'Kane's role was to broker advertisement sales for Impactivate, as well as to participate in investor presentations.  O'Kane was brought on, in part, because of strategic relationships he developed throughout his career in media.  O'Kane's role consisted largely of sales and capital formation.

At first, O'Kane was put on a $5,000 monthly retainer for his services.  In February 2015, the retainer fee became $10,000 per month, and O'Kane continued to bill Impactivate at this rate for the remainder of his time with Impactivate, ending in 2017. (O'Kane Dep. Tr. 131:3-14; Exhibit D).  All of O'Kane's invoices were billed through the corporate entity, BDT.  (Exhibit E). Additionally, O'Kane received Form 1099s from Impactivate for year-end tax returns.  (Exhibit E).  The billing agreements were entered into verbally.  (O'Kane Dep. Tr. 101:1, 106:18-19). O'Kane testified to entering into the agreements with both Bill Smith and Michael Binder, however Binder alleges that he was not aware of the $10,000 billing arrangement until "the very end," and that it was only Smith who authorized it.  (O'Kane Dep. Tr. 107:11-13; Binder Dep. Tr. 57:1-8).

3

In early 2015, Impactivate was in acquisition talks with a company called Nexovation, Inc.  Nexovation was expected to acquire Impactivate, and it was understood that the people at Impactivate, including Binder and O'Kane, would start working at Nexovation.  (O'Kane Dep. Tr. 76:24-25, 77:1-15).

In April 2015, Binder sent O'Kane a letter terminating Impactivate's consulting agreement with him.  This was done under the premise that Nexovation would acquire Impactivate, and that O'Kane would begin working for Nexovation.  (O'Kane Dep. Tr. 80:10-25; Binder Dep. Tr. pgs. 50-52, June 3, 2019).  However, the transaction never materialized, and O'Kane continued to work for Impactivate and bill Impactivate at the $10,000 per month rate.  (O'Kane Dep. Tr. 83:1-17, 150:1-10).

According to O'Kane, he worked in Impactivate's principal Atlantic City location on average of two to three days a week; depending on the season, O'Kane spent some weeks working there every day, and other weeks not working there at all.  (O'Kane Dep. Tr. 133:6-23).  O'Kane also testified to having his own personal office with pictures.  (O'Kane Dep. Tr. 134:2-3).

In 2016, Impactivate fell behind on its $10,000 monthly payments.  As of September 2016, the outstanding balance owed to O'Kane was $132,500.  As of March 2017, Impactivate owed a total of $178,000.  By April 2017, the balance owed peaked at $198,000.  (Pl. Compl. ¶¶ 34- 37).  That same month, Impactivate

made a $45,000 payment, reducing the outstanding balance to $153,000. (Exhibit E).  In June 2017, Impactivate made an additional $40,000 payment, bringing the balance owed to O'Kane to $113,000.  To date, the $113,000 balance has not been paid. (Exhibit E).

O'Kane alleges that Impactivate promised him employment once the necessary capital was raised.  O'Kane alleges that Binder and Defendant Daniel Gallagher, Impactivate's General Counsel, offered him a General Manager position, compensation at a market rate consistent with that role, and guaranteed equity in the range of 5–10%, contingent on the actual amount of capital raised.  (Pl. Compl. ¶ 6).  O'Kane further claims that the offer was made verbally, and as such, there was no written contract.  (O'Kane Dep. Tr. 249–251).

On February 14, 2017, Gallagher sent an email to Binder, Anthony Hibbeln, an Impactivate executive officer and director, and O'Kane.  The email expressed the urgency surrounding Impactivate's capital raising efforts, specifically the importance of securing an investment from a certain proposed investor.  In the email, Gallagher noted that this was an "all hands on deck" effort.  (Exhibit K).

In April 2017, Impactivate received a $9,000,000 investment from the investment group.[1] (Pl. Compl. ¶¶ 7, 43).  Soon thereafter, Impactivate presented O'Kane with a written employment contract.  O'Kane alleges that the proposed employment contract contained terms significantly different than those originally offered.  The proposed contract provided that O'Kane's role would be that of Sales Manager, instead of General Manager; additionally, there was no equity guarantee, but rather a vesting period where O'Kane would be granted 2% equity after a 90-day period, and an additional 2% after two years.  (Pl. Compl. ¶ 48).

Binder testified that Impactivate never intended to make O'Kane a General Manager, and that his role consisted only of sales.  (Binder Dep. Tr. 47:18-25).  Further, Binder claims that the vesting period was implemented in order to ensure that O'Kane's sales activity was consistent with the projections he forecasted, which was $3,000,000 in revenue.  (Binder Dep. Tr. 68:12-25, 69:1-4).

In response, O'Kane points to numerous instances where Impactivate, along with its officers and directors, referred to

---

[1]    Plaintiff's second amended complaint reports the investment amount as being both $6,000,000 and $9,000,0000, and Plaintiff's opposition brief lists the amount as $6,000,000.  Impactivate's Form D filing with the Securities and Exchange Commission reported a $9,000,000 offering.

O'Kane as a General Manager, or GM.  When Impactivate created a mock website for investment pitch purposes, O'Kane was listed as a General Manager.  (Exhibit E).  O'Kane also notes that he was referred to as a General Manager in email correspondence sent by Impactivate.  (Exhibit F).

O'Kane raised his objections to the proposed contract, but Defendants told him it was "probably better to just move on[.]" Ultimately, O'Kane rejected the proposed employment contract offered by Impactivate and filed suit.  (Exhibit O).

In his complaint, O'Kane alleges that Defendants violated the New Jersey Wage Payment Law ("NJWPL") by withholding the $113,000 balance owed to him.  As a result of the alleged NJWPL violation, O'Kane claims he suffered further damages by way of taking on an additional $75,000 loan from his brother.

O'Kane further alleges that he entered into a contract with Defendants, where O'Kane was offered — and subsequently accepted — a General Manager position with the company, along with guaranteed equity.  O'Kane argues that Defendants' failure to perform such obligations constitutes a breach of contract to which O'Kane is entitled damages.

O'Kane's seven-count complaint asserts the following: Count One – violation of the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. 34:11-4.1 to -4.14, for the unpaid balance of $113,000; Count Two – breach of contract for the alleged breach of the

employment contract between Impactivate and O'Kane; Count Three – breach of implied contract and quasi-contract; Count Four – breach of covenant of good faith and fair dealing; Count Five – unjust enrichment; Count Six – Quantum Meruit; and Count Seven – fraudulent inducement and common law fraud.

As to relief, O'Kane is seeking statutory, compensatory, punitive, and liquidated damages; specific performance of Impactivate's alleged obligation to issue O'Kane 5-10% equity in the company; attorney's fees; and any other relief that may be just and proper.

## DISCUSSION

### A.   Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this matter based on the diversity of citizenship of the parties and an amount in controversy in excess of $75,000, exclusive of interests and costs, pursuant to 28 U.S.C. § 1332(a).  Plaintiff is a citizen of Pennsylvania, Defendant Impactivate is a citizen of Delaware (state of incorporation) and New Jersey (its principal place of business), Defendant Daniel Gallagher is a citizen of New Jersey, Defendant Robert Kincaid is a citizen of Illinois, and Defendant John Mortenson is a citizen of Wisconsin.

### B.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is
satisfied that the materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations, admissions, or
interrogatory answers, demonstrate that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law.  Celotex Corp. v.
Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and
all justifiable inferences are to be drawn in his favor."
Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.
2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has
met this burden, the nonmoving party must identify, by

9

affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

Defendants argue that Plaintiff lacks standing to bring all of his claims because Plaintiff's corporate entity, BDT, is the real party in interest that suffered the alleged injuries, and BDT is not a plaintiff in this action.[2]  Defendants also argue that Plaintiff cannot maintain his New Jersey Wage Payment Law claim because he was not an employee of Impactivate.

1.  ***Whether Plaintiff has standing to bring any of his claims***

---

[2] Prior to Defendants filing of their motion for summary judgment, Plaintiff filed a motion for leave to file a third amended complaint to add BDT as a plaintiff.  While the summary judgment motion was still in briefing, Magistrate Judge Ann Marie Donio, U.S.M.J., denied without prejudice Plaintiff's motion.  (Docket No. 65.)

Defendants argue that O'Kane lacks standing to bring all claims asserted.[3]  Defendants argue that O'Kane did not work for Impactivate in his individual capacity, but rather that all work performed was through the corporate entity, BDT, thereby precluding O'Kane from individually bringing his claims.  In support, Defendants cite to several cases which essentially state the "shareholder standing" rule — that shareholders cannot recover individually for injuries to the corporation.

Defendants note that O'Kane invoiced Impactivate through the corporate entity, BDT, and that O'Kane received Form 1099s, reserved for independent contractors, for year-end tax returns. Defendants contend that because O'Kane worked and acted in the scope of BDT, he cannot now seek relief in his individual capacity.  As additional support, Defendants note that O'Kane entered into similar independent contractor agreements in the past, where O'Kane billed and sent invoices through BDT and received Form 1099s for tax-reporting purposes.  As such,

---

[3] Defendants argue that O'Kane lacks standing to bring all of his claims and his complaint must be dismissed in its entirety. (Docket No. 60 at 9.)  Defendants' brief does not address Count VII in O'Kane's second amended complaint, which asserts claims for fraudulent inducement and common law fraud.  (Docket No. 5 at 15.)  As discussed below, because the Court finds that O'Kane has standing to bring his other claims, the case may proceed. The Court takes no position on the viability of Plaintiff's fraud claims, and because no motion has been filed to attack those claims, they may move forward as well.

Defendants argue that these facts demonstrate that O'Kane lacks standing to bring all claims asserted.

In opposition, O'Kane argues that he has the requisite standing to bring his claims.[4] O'Kane argues that promises made regarding future employment, such as guarantees of a General Manager position and an equity stake in Impactivate, were made to him in his individual capacity and not to BDT. Additionally, O'Kane argues that these promises were broken by Impactivate through its CEO, Michael Binder, and its General Counsel, Daniel Gallagher, directly to him, and not his entity.

O'Kane points out that the only evidence Defendants rely on to support the argument that he lacks standing is the fact that O'Kane used the corporate entity, BDT, as a billing and tax reporting vehicle, and that therefore all claims against Defendants must be construed as belonging to BDT. O'Kane disputes this and argues that any promises made regarding future employment were made with respect to O'Kane, the individual, and not to the corporate entity, BDT. As additional support, O'Kane notes that there is no non-billing correspondence between

---

[4] In his brief, O'Kane only references his claims for breach of contract, breach of implied contract and quasi contract, breach of the covenant of good faith and fair dealing, and quantum meruit. He does not specifically argue he has standing to bring his fraud-based claims because, as noted *supra* note 3, Defendants have not moved for summary judgment on his fraud claims.

Impactivate and BDT, and that the Defendants did not testify that they had an arrangement with BDT.

To the contrary, O'Kane points to marketing materials referencing O'Kane as a General Manager, and to documents reporting liability for amounts owed to O'Kane, not to BDT. (Exhibit D; Exhibit E).  Additionally, O'Kane points to a proposed capitalization table, submitted to Impactivate's primary investor, that listed O'Kane individually as the recipient of 4% equity following the proposed transaction. (Exhibit L).  In the totality, O'Kane argues that the evidence supports the existence of an employment relationship between Impactive and O'Kane individually, who ultimately suffered financial harm as a result of Defendants' actions.

Article III of the United States Constitution establishes jurisdiction for federal courts to hear "cases" and "controversies."  U.S. Const. Art. III, § 2.  A three-part test governs whether a party has standing to bring a claim in federal court.  In order to establish standing, a plaintiff must demonstrate: (1) an "injury in fact" that is both "concrete and particularized" and "actual or imminent"; (2) a causal connection between the injury and defendant's conduct that is "fairly traceable"; and (3) that a favorable decision by the Court would likely redress the injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).  Whether a plaintiff has Article

III standing is a question of law for the Court to determine.
McNair v. Synapse Group Inc., 672 F.3d 213, 222 (3d Cir. 2012)
("Our review is plenary . . . to the extent a threshold question
of law, such as Article III standing, bears on our review of
that order."); In re Karwoski, 2018 WL 3742626, at *3 (D.N.J.
2018) (explaining that courts within the district have
recognized that whether a plaintiff "has standing, if
erroneously decided, would result in reversible error on final
appeal" and, therefore, "implicates a controlling issue of
law").

Defendants are correct that "'[i]t is well established
that, absent a direct individual injury, [a] . . . shareholder
of a corporation lacks standing to sue for an injury to the
corporation.'" Kim v. M&T Bank, 2018 WL 4094839, at *3 (D.N.J.
2018) (quoting Meade v. Kiddie Acad. Domestic Franchising, LLC,
501 F. App'x 106, 108 (3d Cir. 2012)); see also Central Jersey
Freightliner, Inc. v. Freightliner Corp., 987 F. Supp. 289, 301
(D.N.J. 1997) (quoting Jones v. Niagara Frontier Transportation
Auth., 836 F.2d 731, 736 (2d Cir. 1987) (citing cases) ("It is a
well-established rule that 'a shareholder—even the sole
shareholder—does not have standing to assert claims alleging
wrongs to the corporation.'").

Where, however, an individual shareholder has alleged a
direct injury to himself rather than harm to the corporation,

14

that shareholder is not barred from bringing his own claims. See Kim, 2018 WL 4094839, at *3 (quoting In re Kaplan, 143 F.3d 807, 812 (3d Cir. 1998) (citing Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 104 (3d Cir. 1986)) ("The derivative injury rule . . . will not bar [the plaintiff's] claims if he seeks to recover for injuries that were inflicted on him individually rather than on the corporation.").

Here, O'Kane has set forth sufficient facts to support injuries he has allegedly suffered separate from those that could be asserted by his corporate entity.  O'Kane has set forth facts showing he, and not BDT, was injured by Defendants' alleged breaches:  Defendants presented O'Kane - not BDT - with a written employment contract; Defendants offered O'Kane - not BDT - a General Manager position with guaranteed equity, a promise that they allegedly breached; Defendants referred to O'Kane - not BDT - as a General Manager; a proposed capitalization table, submitted to Impactivate's primary investor, listed O'Kane - not BDT - as the recipient of 4% equity following the proposed transaction; O'Kane - not BDT - was listed as a General Manager on a mock website Defendants created for investment pitch purposes; O'Kane - not BDT - was referred to as a General Manager in email correspondence sent by Impactivate.

15

Defendants' argument that O'Kane lacks individual standing to bring his various breach of contract claims is based on invoices sent through BDT, and because O'Kane received Form 1099s for year-end tax returns, instead of Form W-2s.  These facts fail to address the alleged promises made to O'Kane, in his individual capacity, by Defendants, and the harm he contends that he, and not BDT, suffered as a result.  Consequently, O'Kane has presented a concrete and particularized injury to confer him standing in his individual capacity to bring claims against Defendants for breach of contract, breach of implied contract and quasi contract, breach of the covenant of good faith and fair dealing, and quantum meruit.[5]  See, e.g., In re Kaplan, 143 F.3d at 812 ("Since Kaplan signed the Workout Agreement in his individual capacity and thereby promised to give First Options his income tax refund, the central question with respect to the standing issue concerns the nature of the

---

[5] As noted above, Defendants have not challenged O'Kane's standing to bring his fraud-based claims.  The Court notes, however, that such claims advanced by a shareholder have been found to be separate from the corporation.  See, e.g., Kim v. M&T Bank, 2018 WL 4094839, at *3 (D.N.J. 2018) ("Kim's claims that M&T fraudulently induced him into signing the Unlimited Guaranty, which he signed in his individual capacity, are thus not barred by the derivative injury rule.") (citing PNC Bank, N.A. v. Star Grp. Commc'ns, Inc., 2017 WL 3638763, at *4 (D.N.J. 2017) (holding that shareholders' "claims based on allegations that PNC Bank fraudulently induced the [shareholders] themselves to sign personal guarantees . . . are clearly not barred by the derivative injury rule").

16

consideration, if any, that Kaplan himself received in exchange
for this personal commitment.  If he received promises in his
individual capacity, he may sue for the breach of those
promises."); Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805
F.2d 96, 104 (3d Cir. 1986) (explaining that the "course of
dealing or conduct of the parties can evidence a contractual
relationship between parties and thus can confer standing on an
individual as a direct party to the agreement"); id. (finding
that even though the note was by its terms payable to Great
Lakes Express Company, the conduct of Refrigerated and the Lakes
shareholders plainly evidenced a contractual relationship
between these parties, because, among other conduct, Koblin
negotiated a payment plan for the Lakes note directly with the
Lakes shareholders, and Koblin recognized he was dealing with
the Lakes shareholders as individuals, and therefore because
Refrigerated directly injured the Lakes shareholders by refusing
to continue payments on the Lakes note, the district court did
not err in concluding that these plaintiffs had standing to sue
under the Lakes note).

  2.   *Whether Plaintiff was an employee of Impactivate*

    Defendants argue that O'Kane was not an Impactivate
employee, but rather an independent contractor, and that
Impactivate satisfies the "ABC" test's criteria used to
determine employment status.  As an independent contractor,

Defendants argue that Plaintiff cannot bring his claim for a violation of New Jersey's Wage Payment Law, N.J.S.A. 34:11-4.1, et seq., to recover the balance of $113,000 of accrued compensation due to Plaintiff by Defendants.

The NJWPL "governs the time and mode of payment of wages due to employees." Hargrove v. Sleepy's, LLC, 106 A.3d 449, 458 (N.J. 2015). The "ABC" test presumes that the claimant is an employee unless the employer can show:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

Id.

Part "A" is referred to as the control prong; Part "B" consists of the "course of business" prong or the "location of work" prong; and Part "C" consists of the "independent business" standard. Carpet Remnant Warehouse, Inc. v. N.J. Dept. of Labor, 593 A.2d 1177, 1185 (N.J. 1991). The failure to satisfy any one of the three criteria results in an "employment" classification. Id. That determination is fact-sensitive,

requiring an evaluation in each case of the substance, not the form, of the relationship.  Id.

To part "A," which addresses the extent to which the purported employee was under the employer's control, Defendants argue that O'Kane never reported to a particular location on a regular basis, and that he did not record his work hours, as he was he not required to by Defendants.  Additionally, Defendants argue that O'Kane was free to exercise his independent judgment when scheduling business meetings, and that O'Kane set his own schedule and performed services for Impactivate at entirely his own discretion.

To part "B," Defendants argue that O'Kane, through BDT, performed all services outside of Impactivate's physical locations.  Defendants argue that O'Kane did not perform any business or solicit any clients within Impactivate's offices.

To part "C," Defendants argue that O'Kane's business, BDT, existed independently from Impactivate.  Defendants point to the fact that O'Kane and BDT serviced other clients while working for Impactivate, and that O'Kane has advertised his independent consulting services on the Internet and LinkedIn for years.

In opposition, O'Kane argues that because he worked for Impactivate in his individual capacity, he has standing to bring his NJWPL claim.  At a minimum, O'Kane argues that there are genuine issues of material fact as to whether Defendants meet

all three parts of the "ABC" test used to determine employment status under the NJWPL.

O'Kane argues that he was sufficiently under Impactivate's control and direction to the extent that Defendants fail to satisfy part "A."

As to part "B" and its "usual course of business" component, O'Kane argues that the work he performed was regularly and consistently in the usual course of Impactivate's business.  Namely, O'Kane argues that as General Manager, he was regularly involved in operations, sales, working with government agencies, quality control, and capital formation.  For part "B"'s "location of work" requirement, O'Kane argues that he frequently worked in Impactivate's principal office, as often as two to three days per week, and sometimes more.  Additionally, O'Kane argues that he regularly performed quality assurance services on the Atlantic City Boardwalk, and that the AC Boardwalk was a location where Defendants "conducted an integral part of its business."

As to part "C" and its requirement that Defendants show that O'Kane was "customarily engaged in an independently established trade, occupation, profession, or business," O'Kane relies on Carpet Remnant Warehouse, Inc. in support of the argument that although he maintained "modest assignments" with other businesses, he was not engaged in an enterprise that was

"stable and lasting."  O'Kane claims that other assignments,
such as those with Rowan University and his involvement in non-
profit work, were essentially "moonlighting" opportunities
requiring less than ten hours of time each month.

     O'Kane argues that he was dependent on Impactivate and that
any additional income from other clients was not sufficient to
sustain himself financially, as evidenced by the fact that he
was forced to take out a loan from his brother once Impactivate
discontinued payments.  O'Kane asserts that he essentially
"joined the ranks of the unemployed," and that he is currently
working for his brother's business in order to pay off the loan.
In addition, O'Kane cites to the CEO, Michael Binder's,
deposition testimony where Binder stated "we kept [O'Kane] alive
. . . [w]e were his only game in town for a long time.  He may
have had dribs and drabs with other deals."  O'Kane submits that
these facts demonstrate that he was dependent on Impactivate,
and similarly that Defendants fail to meet part "C" of the "ABC"
test.

      To further support his arguments, O'Kane relies in part on
Veras v. Interglobo North America, Inc., No. A-3313-16T1, 2018
WL 5316459 (N.J. Super. Ct. App. Div. Oct. 29, 2018).  In Veras,
the lower court granted defendant's motion to dismiss, finding
that plaintiff lacked individual standing to bring a NJWPL claim
because plaintiff's contract with defendant was entered into by

a corporation owned by plaintiff.  On appeal, plaintiff argued that the contract's mere existence should not form the basis for dismissal; the Appellate Division agreed and recognized the importance of looking through the "form" in order to get to the substance.  O'Kane argues, using Veras as support, that standing should not be based on contracts alone, but rather on all facts surrounding the relationship.

Additionally, O'Kane cites to Carrow v. Fedex Ground Package Systems, Inc., No. 16-3026, 2017 WL 1217119 (D.N.J. Mar. 30, 2017), to support the proposition that courts must look to the substance of relationships when making a standing determination.  Of particular note, O'Kane argues that for purposes of a NJWPL claim, an individual does not need to receive payments directly from an employer, and an employer need not make payments directly to an individual.  Therefore, O'Kane argues that even if payments were made to the corporate billing vehicle, BDT, this fact alone does not remove O'Kane's individual standing to bring a NJWPL claim.

Just like his contract-based claims, O'Kane has presented a demonstrable injury personal to him to confer him constitutional standing to assert a claim under the NJWPL.  O'Kane claims that Impactivate owes him $113,000 for work that he performed for Impactivate.  O'Kane claims that Impactivate's failure to pay this outstanding balance has caused him significant injury, such

22

as not being able to sustain himself financially and having to
borrow money from his brother.  Even if Defendants made the
checks out to BDT, Defendants' failure to write the check for
$113,000 to BDT caused a direct and concrete injury to O'Kane.
In other words, BDT was not injured by Defendants' alleged
failure to pay O'Kane his earned wages – O'Kane was.

Defendants' arguments – and O'Kane's response – regarding
O'Kane's NJWPL violation claim do not really speak to O'Kane's
standing and whether he suffered from a concrete and
particularized injury.  The determination of whether O'Kane was
an independent contractor and therefore cannot be afforded the
protections of the NJWPL is a separate inquiry from the Article
III standing analysis.  See Veras, 2018 WL 5316459, at *3
(disagreeing with the defendant's argument that courts may not
apply the ABC test in Hargrove before determining whether the
defendant contracted with the individual plaintiff or the
plaintiff's corporate entity, because the ABC test applies
regardless of whether the individual plaintiff used a corporate
entity to contract with the defendant).

Instead, the parties' arguments concern the substance and
viability of O'Kane's NJWPL claim.  The parties' arguments raise
the issue of whether Defendants have met their burden to
overcome the presumption that O'Kane was their employee by
showing that there are no disputed material facts that O'Kane

23

actually served as an independent contractor.  Defendants have
not met that burden to warrant judgment in their favor.  As the
court in Veras noted, the mere existence of a contract between a
corporate entity owned by plaintiff and the defendant is not
dispositive as to whether plaintiff may maintain a claim under
the NJWPL.  Veras, 2018 WL 5316459, at *3.

O'Kane has presented sufficient material disputed facts as
to whether O'Kane served as an independent contractor or an
employee under the ABC test.  O'Kane claims that his work
regularly consisted of attempts to generate sales activity and
raise capital, which was Impactivate's primary business at the
time.  Additionally, O'Kane testified to working in
Impactivate's Atlantic City office where he had his own office
with pictures on average of two to three days per week.  And
although O'Kane, through BDT, had service agreements with other
clients, he testified that he was dependent on Impactivate for
income, and that he was forced to take out a loan from his
brother after his working relationship with Impactivate came to
an end.  Impactivate's CEO, Michael Binder, even testified that
Impactivate was O'Kane's "only game in town for a long time."

As further support, O'Kane points to marketing materials
that referred to O'Kane as a General Manager, as well as email
correspondence referencing O'Kane as a General Manager.  O'Kane
points to liability and operating expense reports listing

24

amounts owed to employees, including O'Kane in his individual
capacity.  Once O'Kane and Impactivate parted ways, O'Kane
submits that he "joined the ranks of the unemployed."

Defendants have not met their burden on summary judgment to
show no genuine issue as to any material fact that under the ABC
test O'Kane served as an independent contractor and is therefore
not protected under the NJWPL.  It is for the fact-finder to
determine O'Kane's status in his employment relationship with
Impactivate.  See Veras, 2018 WL 5316459, at *6 (quoting Estate
of Kotsovska ex rel. Kotsovska v. Liebman, 116 A.3d 1, 13 (N.J.
2015)) ("Examination of any of these [ABC test] factors is fact-
intensive, which is why 'the question of a worker's employment
status is a matter that is often determined by trial judges and
juries' after considering all of the evidence relating to the
issue, not just the parties' contract.").

## CONCLUSION

For the reasons expressed above, O'Kane has standing to
bring all of his claims, and Defendants have not met their
burden on summary judgment to be entitled to judgment as a
matter of law on O'Kane's New Jersey Wage Payment claim.
Defendants' motion for summary judgment must be denied.

An appropriate Order will be entered.

Date:  January 25, 2021          s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

25